UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

ROBERT BIERENBAUM,

                    Petitioner,          06 Civ. 2120

      -against—                   OPINION

HAROLD C. GRAHAM, the Superintendent
of Auburn Correctional Facility,
ELIOT SPITZER, Attorney General
State of New York,

                Respondents.

------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/25/08

A P P E A R A N C E S:

Attorneys for Petitioner

LAW OFFICES OF MARK SEIDEN, P.A.
100 Sun Trust Building
777 Brickell Avenue
Miami, FL 33131
By: Mark Seiden, Esq.

DUNLAP & SILVERS, P.A.
Suite 601
2601 South Bayshore Drive
Miami, FL 33133
By: Marcia J. Silvers, Esq.

Attorneys for Respondents

NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE
1 Hogan Place
New York, NY 10013
By: Mark Ryan Dwyer, Esq.

**Sweet, D.J.**

Petitioner, Robert Bierenbaum ("Bierenbaum" or the "Petitioner") has filed a petition pursuant to 28 U.S.C. § 2254(d), for habeas corpus relief from a judgment of the Supreme Court of the State of New York, County of New York rendered on November 29, 2000 upon his conviction after a jury trial of murder in the second degree (N.Y. Penal Law § 125.25[1]). For the reasons set forth below, the petition is denied.

## Prior Proceedings

Petitioner last saw his wife, Gail Katz Bierenbaum ("Katz"), on July 7, 1985. An investigation was conducted, and her body was never found. Petitioner was charged in 1999 in New York County Indictment No. 8295/99 with Murder in the Second Degree for killing his wife. After a trial before the Honorable Leslie Crocker Snyder and a jury on October 24, 2000, the jury found Petitioner guilty as charged. Petitioner was sentenced on November 29, 2000, to a prison term of 20 years to life, which he is currently serving.

1

On appeal, Petitioner contended that his guilt of his wife's murder was not proved beyond a reasonable doubt, that hearsay evidence was wrongly admitted against him, and that certain other trial errors were committed. The Appellate Division, First Department, affirmed the conviction on October 22, 2002. 301 A.D.2d 119. Leave to appeal to the New York Court of Appeals was denied on March 10, 2003, by the Honorable Richard C. Wesley. 99 N.Y.2d 626. Petitioner sought certiorari from the United States Supreme Court, but his petition was denied on October 6, 2003. 540 U.S. 821.

After Petitioner's direct appeal was concluded, he moved in the trial court to set aside the judgment on the theory that trial counsel had rendered him ineffective assistance. On September 6, 2005, Petitioner's motion was denied by the Honorable Ruth Pickholz. (Pet. Appendix, Ex. A "PApp: A"). Leave to appeal Justice Pickholz's decision was denied on January 12, 2006, by the Honorable Joseph Sullivan of the Appellate Division. No. M-5835, 2006 N.Y. App. Div. LEXIS 405. Petitioner then filed a petition for a writ of error coram nobis in the Appellate Division, contending that his appellate counsel had rendered him ineffective assistance. The petition was denied on March

2

9, 2006. No. M-6505, 2006 N.Y. App. Div. LEXIS 2772 (N.Y. App. Div. Mar. 9, 2006). Leave to appeal that decision to the New York Court of Appeals was denied on May 30, 2006, by the Honorable Victoria Graffeo. 6 N.Y.3d 892.

The application for a writ of habeas corpus was filed in this Court on March 17, 2006. Bierenbaum has alleged that trial counsel and appellate counsel both accorded him ineffective assistance, in violation of the Sixth Amendment of the United States Constitution and that the admission of hearsay statements violated his right to confront witnesses under that same Amendment. The State has answered the Petition, argument was heard, and the issues were considered fully submitted on October 23, 2006.

On July 7, 2006, Bierenbaum filed a motion for an evidentiary hearing, which was denied on March 7, 2007.

On March 19, 2007, Bierenbaum filed a motion for reconsideration of the Court's denial of his motion for an evidentiary hearing. The motion for reconsideration was terminated for incorrect filing, and Bierenbaum re-filed the motion on July 31, 2007.

3

**The Evidence at Trial**

Petitioner married Katz in August, 1982 (A. Katz: 2438; Doucet: 2652; M. Bierenbaum: 2072).[1] Petitioner had graduated from medical school in 1978, and soon after the wedding he became a resident surgeon at Maimonides Medical Center in Brooklyn (Doucet: 2651; Stipulation: 3006-07). Katz was 26 years old when she married Petitioner (A. Katz: 2431). She was then a psychology major at Hunter College and did odd household jobs on the side; thereafter she became a Ph.D. candidate at Long Island University and a research assistant at Beth Israel (McCollough: 2032; Beale: 2172-73; DeCesare: 2214, 2220-21). Petitioner and Katz ultimately moved into an apartment at 185 East 85th Street in Manhattan (M. Bierenbaum: 2072; A. Katz: 2437).

Katz told her acquaintances that Petitioner was "difficult" (Beale: 2173-74) and "controlling" (Kasenbaum: 2139), and that he fought with her (McCullough: 2036). She told her close friend Maryann DeCesare ("DeCesare") that there was "fighting," that she was afraid of Petitioner's

---

[1] Parenthetical references in this section are to pages of the trial record and names of witnesses giving testimony.

4

"bad temper," and that Petitioner threatened to strangle her (DeCesare: 2215-17, 2218). Over the years, Katz also informed her analyst, Dr. Sybil Baran ("Dr. Baran"), that she was "extremely anxious" about staying with Petitioner, and "extremely afraid" of the arbitrary eruptions of his anger, that Petitioner would become "enraged" if Katz smoked (Baran: 2635) and that Katz was "extremely afraid" that she would not be financially self-sufficient should she leave Petitioner (Baran: 2634-35).

Before the wedding, Petitioner's best man, Edward Doucet ("Doucet"), had observed the two arguing (Doucet: 2653-54). Thereafter, Petitioner advised Doucet that he was "frustrated" and "angry" in his marriage, and that he "argued" with Katz (Doucet: 2655). Similarly, Petitioner admitted to his hometown friend Scott Baranoff that his marriage was "in turmoil" and that he and Katz argued over Petitioner's "time and money" (Baranoff: 2872-74), 2875-76). These disputes involved "yelling and screaming" and became more frequent as time passed (Baranoff: 2876, 2877). Petitioner told his father that he and Katz were having trouble "adjusting" to each other (M. Bierenbaum: 2075).

5

Katz later reported to her cousin, Hilliard Wiese, that on a fall day in 1983 she was studying for her GREs while Petitioner was out, was nervous, and smoked a cigarette on the apartment balcony. Later that day or on the next, she called Wiese and sought his advice. In a hushed and "extremely upset" tone, Katz reported that Petitioner had attacked her and choked her to unconsciousness. This was not the first time Petitioner had choked her, but it was the first time she had passed out (Wiese: 1902-03, 1905-09). Pursuant to Wiese's advice, Katz left the apartment and stayed with her grandfather for at least a month (Wiese: 1910-12; A. Katz: 2444-45).

At about the same time, Katz called her sister, Alayne Katz ("A. Katz" or "Alayne"), "hysterical" and "extremely upset" (A. Katz: 2440). Katz had reported that, "less than a day" before, Petitioner had strangled her. Katz lost consciousness, Petitioner revived her, and he apologized. Katz added that she was unsure what to do (A. Katz: 2440, 2441). On November 12, 1983, Katz filed a complaint against Petitioner at the 19th precinct (Nuhic: 2055-59; P. Ex. 2). Thereafter, Katz's employer, Leigh McCullough, noted bruise marks on Katz's neck that resembled "fingers" (McCullough: 2032, 2034, 2035-36).

6

Katz explained to McCullough that Petitioner had caught her smoking, had become angry, and had choked her (McCullough: 2035). Katz made similar reports to her friends, Denise Kasenbaum ("Kasenbaum"), and DeCesare, and also to Dr. Baran (Kasenbaum: 2140; DeCesare: 2218-19; Baran: 2636). The incident in fact became a "theme" in Katz's sessions with Dr. Baran and at times, because of her mental "conflict" about her marriage, Katz "minimized" the incident (Baran: 2636, 2643).

At around this time, Katz had a "very exquisite" telephone conversation with her former employer, Francesca Beale ("Beale"). In that conversation, Katz stated that she was in fear of Petitioner and asked whether she could move in with Beale and her husband (Beale: 2174). For his part, Petitioner stated to his father at some point in 1983 that he had argued with his wife and that he had "physical contact" with her (M. Bierenbaum: 2075).

Katz considered leaving the marriage and frequently discussed that subject with her sister Alayne, and once asked if Alayne's boyfriend could rent her an apartment (A. Katz: 2443-44). On April 3, 1984, Katz consulted matrimonial attorney, Betty Levinson ("Levinson")

7

(Levinson: 2753-54), paying Levinson with a check drawn on a joint account with Petitioner (Levinson: 2755-57). However, Katz did not attend a second, scheduled meeting with Levinson in August, 1984 (Levinson: 2754-55), and resumed her relationship with Petitioner perhaps as a result of financial considerations concerning Katz' graduate studies, or the pleading of Petitioner's parents (Wiese: 1913; McCullough: 2037-38; M. Bierenbaum: 2094-95; DeCesare: 2223; A. Katz: 2445-46).

Katz repeatedly asked DeCesare whether DeCesare would abandon her husband had he threatened to strangle her should she leave, and told DeCesare that Petitioner had in fact threatened to kill her if she left him (DeCesare: 2221-23, 2224). Katz reported that once, as they watched a movie on television about Claus von Bulow, Petitioner remarked that von Bulow's problem was that he left evidence. Petitioner said that he would not leave evidence (DeCesare: 2223, 2241).

After the 1983 strangulation incident, Katz and Petitioner consulted therapists (McCullough: 2038; M. Bierenbaum: 2094-95; Baranoff: 2876-77). At one point, Petitioner told Doucet that he hoped a therapist could keep

8

his marriage intact (Doucet: 2656).[2] Over the course of the marriage, Katz also spoke to Doucet on occasion and advised Doucet, up until the last time she saw him in the winter of 1984-85, that she was "upset" and frightened about "potential violence" at Petitioner's hands (Doucet: 2656- 57). At about the same time, Doucet ran into Petitioner on the street. Petitioner told Doucet that he was so upset with Katz that he could kill her (Doucet: 2657-59).

In September of 1984, Katz enrolled in graduate school at Long Island University, where she became close friends with fellow student Ellen Schwartz ("Schwartz") (Schwartz: 2665-67). Katz told Schwartz that she was very unhappy in her marriage and was thinking of leaving Petitioner, at least in part because she was afraid of him (Schwartz: 2667-68). She noted in particular an occasion on which Petitioner strangled her upon discovering that she was smoking while preparing for exams (Schwartz: 2668). Another friend with whom Katz discussed the choking incident was Dr. Yvette Feis ("Dr. Feis"), an academic supervisor who became a friend and confidante as well

---

[2] Doucet was not certain of the timing of his conversation with Petitioner, but the reference to Petitioner's therapy suggests that it was after the choking incident (Doucet: 2658-60).

9

(Feis: 2384-88, 2409-10). Katz also reported to Dr. Feis that she avoided sex with Petitioner, to the point of going to bed with her clothes on (Feis: 2386-97).

During the summer of 1984, Katz had become involved in a sexual affair with an investment manager named Anthony Segalas ("Segalas"). On one occasion, she arranged a rendezvous in her apartment, while Petitioner was absent (Segalas: 2346, 2349-50, 2351-54, 2358, 2375-76; Feis: 2410; Baran: 2643). Katz told Segalas that she was "trapped" in her marriage, unhappy, and afraid (Segalas: 2354-56, 2361-62, 2374, 2378, 2379-80). Perhaps twice, they shared "very small" amounts of cocaine, about which Katz seemed "naïve" (Segalas: 2358-61, 2363-64). However, the affair was intermittent, and the two did not see each other much as 1984 turned to 1985 (Segalas: 2356-58, 2361).

In 1985, Katz occasionally told friends that things with Petitioner were "better" (Segalas: 2361-62; Feis: 2409). In February of 1985, however, Katz met a psychologist named Kenneth Feiner ("Feiner") on the subway, and they became close friends (Feiner: 2323-24, 2341-42; Feis: 2409; Baran: 2643). The two saw each other about seven times from February to July, but did not have sexual

10

relations (Feiner: 2325-26, 235-40). Katz told Feiner that
she was "deeply unhappy" and wished to leave Petitioner,
that Petitioner had placed his hand on her neck, and that
they constantly argued (Feiner: 2327, 2340, 2342).

Around the beginning of 1985, Katz separately
told Alayne and Dr. Feis about a letter that she meant to
use to help her free herself from Petitioner. That letter,
addressed to Katz by Petitioner's psychiatrist, warned that
Katz was in danger from Petitioner and advised her to
separate from him (Feis: 2388, 2392-93; A. Katz: 2442).
Katz considered the letter to be "leverage" for divorce
proceedings. She intended, should she not obtain
satisfaction in those proceedings, to use the letter to
"ruin Petitioner's career" (Feis: 2393). Katz told Dr.
McCullough that, to obtain a divorce from Petitioner, she
would threaten to expose allegations that he and his father
had committed a multi-million dollar Medicare fraud
(McCullough: 2040-41).

In late 1984 or the first half of 1985,
Petitioner's co-worker at Maimonides, Nurse Educator Karen
Caruana ("Caruana"), heard Petitioner on the telephone
arguing "very loudly" with Katz (Caruana: 2254-55, 2260-

11

61). Throughout 1985, Katz told Dr. Baran that she was looking for an apartment, had a financial "guarantor"; and seemed to be "landing on the side of leaving" Petitioner (Baran: 2639, 2641). In the early summer, Petitioner and Katz purchased a "half-share" in a summer house in the Hamptons owned by Dolores Ericksen and her husband. Katz told Ericksen that she was "very unhappy," could not stand being without money, and wanted a divorce from Petitioner. Katz added that she could not wait all the time it would take for Petitioner to become a financial success (Ericksen: 2295, 2300-01).

In the weeks leading up to July, 1985, Katz told her sister Alayne that she was "ready to leave." She told her sister that she had informed Petitioner of her intent to use his psychiatrist's letter if he did not agree to a favorable financial settlement (A. Katz: 2446-48). Just after the beginning of July, Katz reported to DeCesare that she had "met someone else," a "psychologist at Downstate" named "Ken Feiner." She "was very happy" and "in love," and planned to ask Petitioner for a divorce (DeCesare: 2224-25, 2229). Katz added that she had obtained a "loan" that Petitioner knew nothing about, and therefore was "financially" able to leave him (DeCesare: 2228-29).

12

Around the 4th of July, Katz advised Schwartz that it was "imminent she was going to tell" Petitioner she was leaving; Schwartz "kind of" thought Petitioner was to get the news over the next weekends (Schwartz: 2668-69). As Katz was still "very concerned" about her finances, Schwartz offered to let Katz move in with her in Connecticut (Schwartz: 2669).

The last time Kenneth Feiner saw Katz was on July 4th. That night they had dinner and "kiss[ed] and a little more" at his apartment before she left in a cab (Feiner: 2325-26, 2330-31, 2335). That evening or shortly before, Katz told Feiner that Schwartz had offered her a place to stay, rent-free, and that she now felt financially able to leave Petitioner (Feiner: 2327-29). Katz and Feiner agreed to meet on July 13th, when they would both be in the Hamptons (Feiner: 2334).

Katz visited her regular gynecologist, Dr. Mary Wilson ("Dr. Wilson"), on July 6th, "probably" before 1:00 p.m. (M. Wilson: 2155, 2158, 2160-61). Katz had obtained a replacement intra-uterine device on June 21st, and was back on July 6th for a follow-up check that proved routine (M. Wilson: 2156-59). Katz was in a "quite jovial" mood (M.

13

Wilson: 2158-59; I. Wilson: 2164-65). When the examination was complete, she made an appointment for December and told the doctor's husband, "see you in six months" (M. Wilson: 2159-60; I. Wilson: 2162-65).

Kasenbaum last saw Katz on July 6th, in the afternoon. Katz said she was "definitely going to leave him" that weekend, and was looking for an apartment (Kasenbaum: 2143-45, 2148-50). Katz was carrying a newspaper with circled apartment listings (Kasenbaum: 2145). Katz reported that she wanted to keep seeing a man with whom she was having an "affair" (Kasenbaum: 2145-46).

Segalas also saw Katz for the last time on July 6th, in a chance encounter on the street (Segalas: 2362-66). Katz seemed excited about work and to be doing well, and talked about moving in with a girlfriend in Connecticut (Segalas: 2362, 2365-66). When Segalas got home, there were "hang ups" on his answering machine. Thinking that Katz might have called, he telephoned her apartment, but Katz told Segalas in a "very brief" conversation that she had not called. Segalas received the impression that someone was with her during their conversation (Segalas: 2366-68).

14

Around the end of June, 1985, Katz had completed a paper on depression and suicide. Years before, she had once attempted suicide herself (DeCesare: 2225, 2233, 2239-40; Segalas: 2355; Baran: 2647). However, Katz gave those who knew her, including her therapist, no reason at all to consider her suicidal during early July, 1985 (Feiner: 2330; Feis: 2404-05; A. Katz: 2448; Baran: 2637-38, 2646). She told Feiner that she was to see her first patient in the week of July 8th, and she was very excited about that (Feiner: 2329, 2334). Dr. Baran noticed that Katz had recently received a pedicure and observed, "[n]o suicidal person has a pedicure" (Baran: 2638). Alayne Katz remembered that, even as Katz was looking to move out, she was planning a party for Petitioner's 30th birthday and that that was typical of Katz; she complained "bitterly" of her problems, but she was always hopeful that difficulties would be resolved in the future (A. Katz: 2449-50).

Petitioner had been very close friends with Scott Baranoff ("Baranoff") and attorney David Ostrow ("Ostrow") in their hometown of West Orange, New Jersey (Ostrow: 2832-35, 2837; Baranoff: 2872-74, 2881). The three had a "reunion" at Baranoff's house on July 3, 1985, when Ostrow

15

visited from Baltimore, and Baranoff came home from Houston
(Ostrow: 2836-39; Baranoff: 2877-78, 2881-82). Ostrow
called Petitioner on July 5th, with Baranoff listening, and
urged Petitioner to come see them again (Ostrow: 2839-40;
Baranoff: 2881-82). Petitioner replied that he could not,
as he and Katz had plans for dinner and movie on July 6th.
Ostrow showed "no sympathy" for Petitioner and began to
"bust [Petitioner's] balls," "cajoling" and "berating"
Petitioner as length (Ostrow: 2840-42; Baranoff: 2886). In
the background, Ostrow could hear what he believed was
Katz's voice "screeching" and "henpecking" Petitioner about
their "date", and Petitioner persisted in refusing to meet
his friends, even when they offered to travel to Manhattan,
even when Ostrow accused Petitioner of being "pussy
whipped" (Ostrow: 2842-43). Ostrow left West Orange on
Sunday, July 7th, at 4:00 or 5:00 p.m. without seeing
Petitioner again (Ostrow: 2843).


Caldwell Airport ("Caldwell"), also known as the
Essex County Airport, was only a 20 minute drive from the
Baranoff residence (C. McKenna: 2467; Baranoff: 2880).
Petitioner, a licensed pilot, routinely rented airplanes at
Caldwell, from McDan Aircraft Rental ("McDan") (M.
Bierenbaum: 2080=82; C. McKenna: 2511). On July 7, 1985,

16

Petitioner rented a Cessna 172 from Mrs. Joan McKenna of McDan, for a period beginning at 4:30 p.m., during which the plan's engine was engaged for one hour and 56 minutes, a period long enough for the Petitioner to fly well over the Atlantic Ocean and then back to the airport (C. McKenna: 2474-89, 2491, 2505-06, 2511, 2514-15; Foresto: 2529-51). Petitioner's rental period ended at 7:30 p.m., apparently having been extended by Petitioner past the 6:00 p.m. conclusion that was initially intended (C. McKenna: 2483-84). It would have been possible for Petitioner to have driven his car directly to the plane and loaded luggage onto it, without coming into line of sight of the McDan office (C. McKenna: 2490-91, 2501-03, 2512).

The evening of July 7th, 1985, Petitioner attended a birthday party for his nephew in Upper Montclair, New Jersey at which Petitioner's father, Marvin Bierenbaum, was present, arriving at about 6:30 p.m. without Katz, though she was expected (M. Bierenbaum: 2067-68, 2076-77, 2079, 2103-04; A. Katz: 2448-49). Petitioner explained that Katz had "gone out earlier in the day" and had not returned to come to the party with him (M. Bierenbaum: 2077-78). When the elder Bierenbaum left at

17

about 8:30 p.m. Petitioner was still at the party. He was sleeping on a couch (M. Bierenbaum: 2079-80).

At about 9:00 p.m., Baranoff returned to his parents' home from dinner and, to his surprise, found Petitioner there (Baranoff: 2879). Petitioner now appeared "distraught," and reported that he and Katz had argued that morning and as Baranoff recounted it at trial, Petitioner said that "she had left the house, dressed in shorts and halter top and sandals. Either he had said she was going to the park or she was headed to the park. And she had not yet returned" (Baranoff: 2879). Petitioner added that he was worried, and he called his apartment "a couple of times" from the Baranoff household (Baranoff: 2879). Although Petitioner mentioned that he had just been to visit his family, he did not tell Baranoff that he had flown an airplane from nearby Caldwell Airport that afternoon (Baranoff: 2879-80). During a number of conversations that Baranoff later had with Petitioner about July 7, 1985, Petitioner never mentioned that he had flown that day (Baranoff: 2780-81).

At about 11:45 p.m. on July 7th, Petitioner left a message for Dr. Feis, and the two spoke shortly

18

thereafter (Feis: 2393-94, 2410-11). Petitioner told Dr.
Feis that Katz was missing. He stated

> that in the morning he and Gail had an argument
> and that she left the apartment to go to Central
> Park. He told me that she never returned. He
> went to a family party in New Jersey and when he
> came back she was still missing so he was calling
> me to find out if I knew where she was

(Feis: 2394). Dr. Feis stayed in very frequent contact
with Petitioner in the days that followed and either in
this first conversation or almost immediately thereafter,
began persistently to urge Petitioner to take the matter
seriously and contact the police (Feis: 2395-98, 2411-13).
During their conversations, Dr. Feis also urged Petitioner
to hire an investigator, and was "surprised" when she
learned that he hired a lawyer first (Feis: 2412-13).
Neither when they initially spoke, nor on the "many, many
times" in later days that Dr. Feis asked Petitioner about
"what he did, what [Katz] did" on July 7th, did Petitioner
tell Dr. Feis that he had flown a plane that day (Feis:
2394).

Katz did not appear for her noon appointment with
Dr. Baran on Monday, July 8th. At 12:10 p.m., Petitioner

19

called Dr. Baran and asked whether Katz was with her.
Petitioner added that he and Katz had argued and that she
had gone off "in a huff" (Baran: 2638). That same day,
Petitioner called Katz's mother who advised Alayne Katz of
Petitioner's report that Katz had not come home on Sunday
night (A. Katz: 2452). Also on that day, Petitioner called
Kenneth Feiner to ask if he had seen Katz (Feiner: 2332-33)
and to Feiner, Petitioner's voice seemed "flat" and
"stilted" (Feiner: 2333).

On July 8th, Petitioner called Schwartz who told
Petitioner that Katz was not with her and Petitioner then
advised Schwartz that he had spoken to Dr. Baran and that
Dr. Baran had said Katz was "very depressed," and that Katz
might "do something to hurt herself", and Petitioner added
that Katz "had asked [him] for a divorce" (Schwartz: 2670-
71; O'Malley: 2703-06). According to Dr. Feis, Petitioner
"didn't seem very interested" in her suggestions about
concrete steps to find Katz, in particular that he speak to
the doormen at his apartment building (Feis: 2395-98). Dr.
Feis felt it necessary on her own to call the morgue, the
police, and the press (Feis: 2398).

20

Petitioner appeared at the 19th precinct at about 9:00 p.m. on July 8, 1985 and filled out a missing person report indicating that, when he last saw Katz, she had been wearing pink shorts, a white t-shirt, and "some engagement rings" (Dalsass: 1933-34, 1939). Beginning at about 9:30 p.m., Petitioner spoke for about forty-five minutes with Detective Virgilio Dalsass ("Dalsass") of the precinct's Missing Person Squad (Dalsass: 1934-36) and related that he and Katz had had an argument on the morning of July 7th, that she had gone to Central Park at about 11:00 a.m. to "get some sun" and never returned (Dalsass: 1936-37, 1988-89). Petitioner specified that he had remained home until 5:30 p.m., and in the intervening period, had received several telephone calls and at 5:30 p.m., went to his parents' house (Dalsass: 1936). Petitioner further advised the detective that Katz had tried to commit suicide in the past, and that she had been hospitalized (Dalsass: 1941). Petitioner did not mention that he was a pilot and when recounting the details of his actions on July 7th, did not say that he had flown a plane that day (Dalsass: 1942).

Detective Dalsass asked Petitioner for information about friends and relatives who might know where Katz was, stating that such information would be

21

"very beneficial" in locating Katz, and Petitioner responded that he had dinner plans and that he would address those subjects from home later that night (Dalsass: 1941-42, 1962-63). Detective Dalsass called from home later that night (Dalsass: 1941-42, 1962-63). Detective Dalsass called Petitioner at about 12:30 a.m. on July 9th, but was obliged to leave a message on Petitioner's answering machine and from then until July 14th, the detective left half a dozen or more additional messages for Petitioner, but did not receive a reply (Dalsass: 1942-43). After the interview on July 8th, uniformed officers searched the blocks around Petitioner's apartment, and the area from Petitioner's apartment to Central Park, with negative results (Dalsass: 1966).

On Wednesday, July 10th, Detective Thomas O'Malley ("O'Malley") of the police department's central Missing Person Squad talked to Petitioner by telephone, when Petitioner called to offer assistance to the investigation (O'Malley: 2685-97). Petitioner stated that he and Katz had argued, and that she left to go to Central Park (O'Malley: 2723). The detective asked whether anyone had seen Katz leave "that day," and Petitioner reported that "the doorman Edgar had told [Petitioner] that he had

22

seen [Katz] shortly after eleven o'clock" on July 7th (O'Malley: 2687-88, 2692). However, Edgar Rivera, the only doorman on duty at Petitioner's building on the 7:00 a.m. to 3:00 p.m. shift on July 7th, recalled seeing Katz on Saturday, July 6th, but not on Sunday, July 7th (Rivera: 2593-94; Lienau: 2602-05). On July 10th, Petitioner called Segalas, who offered his help in locating Katz; Petitioner did not ask Segalas who he was because, as Segalas put it at trial, "[h]e knew who I was" (Segalas: 2369-70).

In the "middle of the week," Petitioner reported Katz's disappearance to Doucet and told him that "he had not seen her since" (Doucet: 2660-61). Petitioner added that he thought Katz had been "seeing someone" but did not mentioned that he flew a plane on July 8th (Doucet: 2362). About the same time, Caruana noted that Petitioner had appeared for work at Maimonides Medical Center unshaven and looking "very disheveled," as if he had not slept (Caruana: 2261). Petitioner advised Caruana and other Maimonides employees that his wife was missing (Caruana: 2261-62).

Petitioner spoke to Detective O'Malley again on July 13th when he was escorted to the detective's office by Katz's parents (O'Malley: 2688-89, 2726-27). The detective

23

asked Petitioner to relate the events of July 7th as completely as possible (O'Malley: 2689, 2695-95) and Petitioner reported that, on Saturday the 6th, he and Katz had a "mild" dispute, that on Sunday the dispute "continued" until Katz left for Central Park at about 11:00 a.m. to "cool off" (O'Malley: 2689). Petitioner did not mention that Katz took anything with her (O'Malley: 2701). Petitioner reported that he thereafter "hung around" the apartment, that Katz never returned, that he went to his sister's house in New Jersey, left that house at 8:00 or 9:00 p.m. to visit his friend Scott, checked his home telephone for messages, and ultimately returned home at about 11:00 or 11:30 p.m. (O'Malley: 2689-90, 2723-24). Before going to bed, Petitioner called Katz's mother, her friend "Deborah," and Schwartz, but learned nothing of Katz's whereabouts (O'Malley: 2690-91). Petitioner added that he reported Katz's disappearance to the police only at 9:30 p.m. on July 8th, after he was urged to do so by "friends," because he had believed that she would return (O'Malley 2691). In the course of his narrative, Petitioner did not mention the New Jersey flight (O'Malley: 2695, 2699) and did not indicate that he left his apartment before he went to his sister's house that day (O'Malley: 2700).

24

During this conversation with Petitioner, Detective O'Malley also asked about the doorman's supposed sighting of Katz at 11:00 a.m. on July 7th, which Petitioner had reported in their telephone interview on July 10th. Petitioner advised the detective that he had spoken again to Edgar, and that "Edgar now thinks it may have been some other day . . . . [H]e believes it was another day" (O'Malley: 2691-92). Petitioner told the detective that his marriage "was going pretty bad, it was terrible," that he and Katz were "always having fights," and that they were in therapy (O'Malley: 2692, 2724-25). Petitioner denied that he had ever hit his wife and when Detective O'Malley asked if he had strangled her to unconsciousness, Petitioner "very abruptly" answered "no, I don't want to speak about that" (O'Malley: 2692-93). Petitioner did report that Katz was "depressed" and "suicidal" and said nothing about the possibility that she was killed by drug dealers, or was alive in California (O'Malley: 2696, 2698-99). At the end of the interview, Petitioner said, "this [doesn't] look right. People are going to start to wonder." Upon the detective's request for clarification, Petitioner noted, "it is obvious, isn't it?" (O'Malley: 2724-25).

25

On July 14, 1985, a week to the day after Katz disappeared, her relatives and friends met at Petitioner's apartment and spent hours in the area between Petitioner's apartment and Central Park, posting notices and inquiring whether anyone had seen Katz the previous Sunday, and the answers all were negative (DeCesare: 2229-2234; Feis: 2399-2400; Segalas: 2372; A. Katz: 2452-54). During the canvass, Petitioner's father "was doing most of the direction" (DeCesare: 2230). DeCesare asked Petitioner where he thought Katz might be and he answered that he "thought she was on a shopping spree at Bloomingdale's" and that "you know what a JAP she was" (DeCesare: 2232).[3] Petitioner also told DeCesare that "they had a fight and she walked out," that he wondered why she "went out without her shoes on," and that she had not had her rings on (DeCesare: 2232-33).

Near the Central Park reservoir, Petitioner reminded DeCesare that Katz had been working on a paper about depression, had tried to commit suicide when she was younger and asked, "how [do you] know" that Katz did not

---

[3] DeCesare explained for the jury that a "JAP" is a "Jewish American Princess" (DeCesare: 2232).

26

"become depressed when she was working on this paper and . . . that she didn't kill herself" (DeCesare: 2233). Petitioner "got angry" and continued, "how do [you] know that [Katz] hadn't climbed the gate. How [do you] know she didn't climb the gate of that reservoir. How do [you] know . . . she wasn't lying at the bottom of that reservoir, that she didn't climb the gate and jump into the reservoir" (DeCesare: 2234).[4]

Dr. Feis was another volunteer who canvassed the neighborhood on July 14th (Feis: 2399-2400); while back at Petitioner's apartment, Dr. Feis listened as someone asked what had happened to the large area rug that had previously been in the living room; Petitioner answered that the rug had been sent out for cleaning and when challenged about how he had time for such matters with his wife missing, Petitioner specified that the cat had messed on the rug (DeCesare: 2234-35; Feis: 2400-01). Dr. Feis asked why Petitioner though Katz had gone to Central Park, and he replied that she had taken "something" to lie down on,

---

[4] DeCesare occasionally spoke to Petitioner again during the following months about the search for Katz. Petitioner always made "references to the water," such as that he thought she might be "waitressing by a seaside community" or "cooling off" (DeCesare: 2235-36).

27

"like when she would go to the park to sunbathe" (Feis: 2402).

Although Petitioner did not respond to telephone messages from Detective Dalsass after their initial discussion of Katz's disappearance (Dalsass: 1943), and the detective was left "rather frustrated," from Katz's family he learned of efforts being made to find her; through Alayne Katz, Detective Dalsass arranged to meet Petitioner at 4:00 p.m. on July 14th, after the canvassing session's completion (Dalsass: 1943-46). Accompanying Petitioner were his father and Katz's parents (Dalsass: 1944-46).

Detective Dalsass began the meeting by emphasizing that even "insignificant" details could be critical in locating Katz (Dalsass: 1947) and he asked Petitioner to narrate where he and Katz had been in the days before her disappearance, and urged him not to omit anything (Dalsass: 1947-48). In response, Petitioner described what he and Katz did on Friday and Saturday, July 5th and 6th, mentioned Katz's gynecology and hairdressing appointments, and some shopping the two of them did at a bagel store, a lingerie shop, and a pet food establishment and added that he and Katz had argued during these errands

and thereafter, but refused to explain the argument (Dalsass: 1950-53). Petitioner noted as well that he and Katz had "a couple of steaks" for dinner on July 6th, that Katz arose at about 9:30 a.m. on July 7th, that she declined to have breakfast, and that she spoke on the telephone to Beale about Beale's desire to consult a surgeon and then, saying that she wished to get some "sun in the park" behind "the museum," Katz left at about 11:00 a.m. (Dalsass: 1954), wearing pink shorts and a white t-shirt, and "possibly" took a towel with her (Dalsass: 1955).

Petitioner said that he stayed in his apartment until 5:30 p.m. on the 7th, taking telephone calls there, including one from "Debra" concerning a dinner party that Petitioner had missed the previous evening and that he was "positive" that he left his apartment at 5:30 p.m. to go to a birthday party in West Orange, New Jersey but Petitioner did not mention that he was a pilot, or that he flew a McDan Aviation plane on July 7th (Dalsass: 1955-58, 1964).

Petitioner told Detective Dalsass that he was at that family birthday party from about 6:30 to 10:30 p.m. (Dalsass: 1955-58, 1963) and that after a brief stop at the

house of his friend Scott, he returned home at about 11:30 p.m. on July 7th, called Katz's mother and Schwartz, and then retired for the night (Dalsass: 195-597-98) and that on July 8th, he went to work and reported his wife's disappearance at the 19th precinct at about 9:00 p.m. (Dalsass: 1959).

Despite all the detail, Detective Dalsass felt "frustration" when he made follow-up inquiries of Petitioner (Dalsass: 1960-62). When the detective asked about the name of the bagel store or the pet food establishment, Petitioner would answer that he did not know, or that he would reveal that information "later" (Dalsass: 1961-62). Although Petitioner said he would be home after he had dinner with his father, when the detective called at 12:30 a.m. on July 15th he reached only Petitioner's answering machine (Dalsass: 1962-63).

Based on information from Alayne Katz, Detective Dalsass spoke to Anthony Segalas on July 16, 1985, and to Kenneth Feiner on July 19, 1985; both were cooperative, and neither hesitated to provide information (Dalsass: 1971-74).

30

At some point during July, 1985, Detective Dalsass asked to look around Petitioner's apartment and Petitioner said that he would get back to the detective (Dalsass: 1977, 1998-99). On September 12, 1985, Petitioner and his attorney, Scott Greenfield ("Greenfield"), met Detectives Dalsass and O'Malley at Greenfield's office, and Petitioner agreed that the police could enter the apartment (Dalsass: 1975-77, 1999-2000). On September 30th, when Detective Dalsass and members of the Crime Scene Unit arrived at Petitioner's apartment, Greenfield limited what they could do: the officers were permitted to look only for samples of Katz's fingerprints, and for a diary and address book and could not, as they had intended, search for blood and hair, examine rugs, check for fresh paint, and otherwise explore whether a crime occurred in the apartment (Dalsass: 1978-80). Petitioner's private investigator was present, and when Detective Dalsass used the bathroom, that investigator shadowed the detective as far as the bathroom door (Dalsass: 1980).

In the ensuing weeks, Dr. Feis spoke with Petitioner daily "or even more" (Feis: 2403-04). Petitioner told the doctor that he thought it was possible that Katz committed suicide, or that she "just went off"

31

(Feis: 2404). During one of their conversations, however, Petitioner conceded that the argument he had with Katz on the morning of July 7th was "more severe than he had told people before (Feis: 2405-06). According to Petitioner, despite advice he had had from a psychiatrist, "this time" he "did not defuse the situation" and the argument became "explosive" (Feis: 2406-07).

In October, 1985, Alayne Katz, accompanied by her boyfriend, went to Petitioner's apartment in hopes of retrieving Katz's belongings. A "terrible" scene ensued. There were "trash bags all over the place with all of her things thrown in it" (A. Katz: 2454-55). Among these items were "her clothes, her personal papers, she wrote poetry, her letters . . . photographs . . . toiletries . . . ." (A. Katz: 2459). The Petitioner would not give Alayne Katz items she particularly wished to take: Katz's "bicycle . . . skis, certain jewelry and then there was a crystal dish my aunt had given . . . we had a fight at that point" (A. Katz: 2455). In that "fight," Alayne Katz "yelled at [Petitioner] that he killed my sister and he can't have her things" (A. Katz: 2455). Petitioner denied the accusation and added that Katz "was a tramp" and was "off living with someone else" (A. Katz: 2455).

In the months before and after that conversation, Alayne Katz sent letters seeking information to the 500 or so people in Petitioner's building, to all the doctors in the hospitals where Petitioner was a resident, and to "all of [Katz's] friends" (A. Katz: 2455-57). No one reported seeing Katz after July 7, 1985 (A. Katz: 2457).

In the meantime, in July, Petitioner had resumed his visits to the Hamptons "share" house which he and Katz had joined and advised his housemate Susan D'Andrea ("D'Andrea") that Katz was "missing" and related

> that they had gotten in a fight and that she had taken a towel and some suntan lotion and had gone to Central Park. She wanted to cool off and he waited a couple of hours and then he went looking for her and he found the towel and the suntan lotion but she was gone . . . .

(D'Andrea: 2282-83).

At trial, D'Andrea added "That is very clear in my mind" and when D'Andrea asked Petitioner what he thought had happened to his wife, he "just looked at me" (D'Andrea: 2283). D'Andrea continued, "do you think maybe someone

kidnapped her," and Petitioner "just shrugged his shoulders" (D'Andrea: 2283). Petitioner said, "I don't know. I don't know" (D'Andrea: 2284). It was "matter of factly. He wasn't upset. He was just very low keyed . . ." (D'Andrea: 2284). D'Andrea recalled that Petitioner kept coming to the "share" house during the remainder of the summer and once announced that he would be distributing "missing persons posters," but D'Andrea never saw any (D'Andrea: 2285-86). In those months, Petitioner was "going out" in the Hamptons (D'Andrea: 2286, 2292-93). During cross-examination, at least as recorded in the transcript, D'Andrea made various statements to the effect that after July 7, 1985, Petitioner was, or was not, "upset," "dull," "somber," or "dazed."

The house "landlady," Dolores Ericksen, heard from Petitioner by telephone on one of "his" July weekends and Petitioner said that he and Katz had fought, and that he was coming out alone (Ericksen: 2302). When Petitioner arrived, he confirmed to his housemates

> that they had a fight and that she stormed off
> and went to the park . . . . [H]e said he tried
> to look for her. He said that she left in a pair
> of shorts with a towel and he had gone to look
> for her . . . . [H]e went after to see where she

34

was and he asked people where she was and they
said they had seen her but not that day....He
said she was wearing a pair of shorts and she
walked out with a towel. That's all she had, and
some money, just a few dollars . . . . [L]ike
six dollars . . . .

(Ericksen: 2303-05, 2313-15). When Petitioner was asked
what he thought happened to Katz, he added

he thought she had a drug problem because he went
through her drawers after she left and he found
cocaine, and he believed that she might have gone
off with drug dealers and disappeared with drug
dealers

(Ericksen: 2305, 2310-11).

Petitioner came out to the share house for the
remainder of the summer, including a more extended stay on
weekdays during the month of August (Ericksen: 2305-06).
In the days after Katz's disappearance, Petitioner "seemed
to be going out a lot," dressing up and sometimes staying
out "very late" (Ericksen: 2306-08). For example, on his
first weekend in the Hamptons after Katz disappeared,
Petitioner went to a comedy club, where he "seemed to be .
. . having a good time" (Ericksen: 2309, 2311-12). Yet at
the end of the summer, as Petitioner was packing his

clothes, he seemed "teary eyed" and Ericksen said to him, "This must be hard for you" to which he replied, "yes it is" (Ericksen: 2312-13, 2315-16, 2317-18).

Petitioner and Caruana, one of his companions in the Hamptons, had dinner at his house on a weekday evening, and began a sexual affair that night (Caruana: 2262-65). The affair continued in Manhattan, and lasted about six weeks (Caruana: 2265, 2266, 2272-73). Then, during dinner in a restaurant, Petitioner "suddenly attacked [Caruana] verbally for something that [she] had said that [she] thought was fairly harmless" (Caruana: 2265-66). Caruana walked home crying, and did not see Petitioner socially again (Caruana: 2266).

During his relationship with Caruana, Petitioner had not expressed concern for Katz (Caruana: 2272). Petitioner did advise Caruana that when Katz left to "cool off" in Central Park, she left her valuables and her personal belongings in the apartment (Caruana: 2266-67). Petitioner also said that he had hired a private investigator and according to Petitioner, the investigator had "found evidence of [Katz] out in California" (Caruana: 2268). Petitioner opined that, though she did not take her

36

credit cards, Katz was "probably" receiving financial assistance in California from her family (Caruana: 2270-71). Petitioner added that "his apartment and car had been searched" and that he was "clean" as to a police investigation (Caruana: 2268-69). That last statement was "certainly" made before the end of September, 1985 (Caruana: 2269).

In the fall of 1985, Petitioner supervised the work of Roberta Karnofsky ("Karnofsky"), a medical student doing clinical work at Coney Island Hospital (Karnofsky: 2259-61). He began to "flirt" with Karnofsky — for example, "many times" seeing to it that she would be on his side of an operating table and then rubbing up against her during surgery (Karnofsky: 2761-62). They dated, and perhaps in September, 1985, Karnofsky moved into Petitioner's apartment (Karnofsky: 2762). Early in the relationship, Petitioner advised Karnofsky that his wife had "disappeared":

> he indicated to me that they had a lot of marital problems and that they had been arguing one Sunday afternoon, I believe it was, and that they had a particularly bad argument that day and that she was very angry and she stormed out of the apartment and went to cool off in Central Park

(Karnofsky: 2762-63). Petitioner added "that she had been seen one time around the area of Central Park" but then was never seen again (Karnofsky: 2763). Petitioner doubted that Katz would return, and reported that "it was possible she was in some type of a fugue state" (Karnofsky: 2763). Karnofsky explained at trial that a "fugue state" is one caused when "someone has undergone a traumatic event at one time or another" and "they maybe [are] wandering around out in public someplace and they don't know who they are or where they are, kind of a state of confusion" (Karnofsky: 2764).

Petitioner also "once or twice" opined to Caruana that Katz "might have run off with someone," that she had had affairs during the marriage, and that "it was possible she had run off with someone and was living somewhere maybe in the Caribbean" (Karnofsky: 2764). Petitioner advised Karnofsky that the police had "looked in the incinerator" to see "if he threw her body" there, that the police also asked whether Petitioner had the rug taken out and cleaned, and that according to Petitioner, he told them he had not had the rug cleaned (Karnofsky: 2770).

Karnofsky lived in petitioner's apartment for slightly less than a year, until she discovered that he had entertained another woman there (Karnofsky: 2765, 2803-04). While Karnofsky lived with Petitioner, Petitioner emptied out only a couple of drawers for her and accorded her just part of a closet. Katz's many belongings were kept "as if she was living in the house"; Petitioner refused Karnofsky's requests that he move them (Karnofsky: 2766). He gave only "a small amount" of Katz's belongings to her sister Alayne, and only after making sure that Karnofsky would not be present when Alayne arrived for them (Karnofsky: 2766-067). However, during her year with Petitioner, Karnofsky did not see him make any efforts to find Katz (Karnofsky: 2767). On one occasion, Petitioner received a telephone call at 3:00 a.m. Petitioner asked the caller, "do I need to come down right now?" He then told Karnofsky that "a woman" had been found at a bus terminal and "they wanted him to come down and identify whether or not this was Gail;" Karnofsky asked whether she should pack and leave, but Petitioner reassured her, "don't worry about it. I doubt [that] it is" Katz (Karnofsky: 2767-69). When Petitioner returned, "[a]ll he said was, it wasn't" Katz (Karnofsky: 2770).

During Karnofsky's time with Petitioner, she frequently saw him carrying heavy duffel or flight bags. When he carried one of his bags and one of Karnofsky's, Petitioner would be transporting about 100 pounds, and he seemed to have no difficulty with the weight (Karnofsky: 2771-72, 2816-18). Karnofsky and Petitioner often used an "unmanned" rear exit from Petitioner's building that led to a parking garage; Petitioner kept his car in another garage about two blocks farther away (Karnofsky: 2773-76).

One day, Karnofsky had heard messages on the answering machine "accusing [Petitioner] of murder," apparently messages from Katz's mother and during dinner at a restaurant that evening, after Petitioner and Karnofsky themselves had had a "minor disagreement," she posited to Petitioner how he might have gotten rid of Katz:

> I think that if you did this and if it really happened as some people seem to think it did, that perhaps something happened in the apartment and you intentionally or unintentionally—[Katz] was hurt, you could have put her in one of those big flight bags or duffel bags and carried her out of the apartment since she was very small, put her in the back of your car, driven out to the airport and thrown her body out of the plane

(Karnofsky: 2778, 2810). Karnofsky was "a little bit angry" and not "joking" at this point, but Petitioner just looked at her and gave "[e]ssentially no reaction" (Karnofsky: 2780, 2808-09).

During the latter part of Karnofsky's year with Petitioner, Sharon Alongi ("Alongi"), her friend and classmate, stayed at Petitioner's apartment (Karnofsky: 2779-80). On one occasion when Petitioner was not present, Karnofsky presented her theory to Alongi, and the latter asked to see Petitioner's flight log (Karnofsky: 2781). They located the log and

> observed that there was an entry in the flight
> log that appeared to be—initially appeared to be
> dated 8/7/95 but it was quite apparent that the
> date of the entry had been changed from the—
> underneath original entry was clearly to us
> having been written to be 7/7/85

(Karnofsky: 2782-83, 2794-95; P. Ex. 19).

Dr. Stephanie Youngblood ("Dr. Youngblood"), a chiropractor, met Petitioner on New Year's Eve at the beginning of 1989 and he and she then lived together in Las Vegas, Nevada for two-and-a-half to three years, beginning

about March 1989 (Youngblood: 2287-90). Petitioner initially told Dr. Youngblood that he had never been married, but she saw Katz's name on bank statements and luggage tags, and eventually asked him who "Gail Bierenbaum" was (Youngblood: 2890). Petitioner was "upset" and "a little bit teary eyed," and it "took him a little while to answer" and then said he had been married, that one day his wife "left the apartment" after a fight to go to Central Park, and that she never returned (Youngblood: 2891-92). Petitioner added that he was "taken in for questioning" a couple of times (Youngblood: 2891). Petitioner felt his wife had been murdered, noting that he had learned she had a "drug problem" and affairs (Youngblood: 2892). Specifically, Petitioner felt she "went to Central Park to hang out with her druggie friends. It was probably a drug related death" and Youngblood concluded that Petitioner was "a victim in the whole situation" (Youngblood: 2892).

Petitioner also told the doctor that, after Katz disappeared, he went to "either a party or friend's house out in New Jersey" and that he became nervous when she did not come home the following day. Dr. Youngblood had flown with Petitioner, and knew that he made entries in a flight

42

log every time they flew, but Petitioner did not mention to Dr. Youngblood that he flew a plane on the day Katz disappeared (Youngblood: 2892-93).

Petitioner and Carol Fisher ("Fisher"), a healthcare industry executive in Las Vegas, were "fixed up" on a blind date in January, 1995 (Fisher: 2823-24, 2829-30). They entered into a relationship that lasted six or seven months, until Petitioner advised Fisher in a cell phone call that he would not continue to date her because she had a child (Fisher: 2824, 2828-29). On the first night they went out, Fisher asked if Petitioner had been married; he was "hesitant" to answer and Fisher decided to make a joke: she asked Petitioner if he killed his wife (Fisher: 2824-25). Petitioner was "pretty surprised and stunned . . . pretty shocked" (Fisher: 2825). He looked "kind of pale," and asked what Fisher knew (Fisher: 2826). When she asked what had happened, Petitioner told her

that they had an argument[,] they were going [to], I believe a birthday party for his nephew, they had an argument, and she had left abruptly. She was upset and left in her shorts and a halter top. I recall him talking to me about the fact that she had drug problems and had potentially [maybe] dated others, was having affairs during their marriage

43

(Fisher: 2826-27). At other times, Petitioner said that he
thought "possibly that she had committed suicide" and he
"also had suggested that foul play -- she had been involved
with a variety of men" (Fisher: 2827).

During their relationship, Petitioner and Fisher
flew together "a lot" (Fisher: 2827). She observed that he
was "pretty compulsive, obsessive and meticulous" in making
entries in his flight log (Fisher: 2827-28, 2830-31). In
addition, during Petitioner's time with Fisher, the two
occasionally argued and Fisher "vividly" recalled that on
one of these occasions Petitioner told her that she "should
have seen his temper in the past" and that he had gotten
"much better" (Fisher: 2828).

Dr. Charles Hirsch ("Dr. Hirsch"), the Chief
Medical Examiner for New York City, advised the jury that,
prior to the onset of rigor mortis, a dead person's body --
and especially a small body -- is "pliable." The body of a
person who was about 5 feet 3 inches tall and weighed about
110 pounds could easily be folded and tied into a package
that would be only about 36 inches long (Hirsch: 2851,
2859-61). Alternatively, a body might be "disarticulated"

at the joints, with the head and four limbs severed, to make identification difficult or permit the body to be "concealed or disposed of." Such a process was "very simple"; anyone who had taken an anatomy class in a United States medical school could disarticulate a body in minutes. Given a sharp knife, the doctor continued, he could perform the task in perhaps ten minutes (Hirsch: 2855-59).

Doorman Edgar Rivera ("Rivera") and building superintendent Susan Maras ("Maras") described the exits from Petitioner's building. The building had a front door watched by a doorman, a service exit that was not staffed on weekends, and a third exit into a commercial garage (Rivera: 2592, 2596; Maras: 2979, 2984-94, 2997-98, 2999-3000). A camera was placed near the service exit and another by the garage exit, but in 1985 no recordings were made with those cameras (Maras: 2294-96). The camera images could be seen by the doorman at the front door, but there was only one doorman, and he had to perform services for the tenants of the 442 apartments in the building (Rivera: 2593; Maras: 2996, 2999).

Joseph Foresto ("Foresto"), a safety inspector for the Federal Aviation Administration, advised the jury that a Cessna 172 -- the "base line, the hallmark training aircraft" of this era -- is "very user friendly," "stable," "easy to handle," and "a very basic simply aircraft" (Foresto: 2521-22, 2526-28). Charles McKenna ("McKenna") of McDan Aviation agreed that the Cessna 172 was "pilot friendly" and "probably one of the easier airplanes ever built as far as flying." If the pilot took his hands off the controls the airplane would stay "pretty much straight and level" (C. McKenna: 2503-04). The New York region is "congested" and "restricted," but Foresto believed that in 1.9 hours a Cessna 172 could make a round trip, with clearances, from Caldwell Airport as far as Albany to the north, "almost" to Cape May, New Jersey to the south, or could fly perhaps 100 miles directly out over the Atlantic Ocean and then return (Foresto: 2529-51). McKenna estimated that a 170 mile round trip could be made (C. McKenna: 2505-06, 2508). Official tapes concerning such a flight and its clearances would routinely be erased after 15 days (Foresto: 2548-49, 2258-60). McKenna advised the jury that no flight plan would have to be filed by a pilot renting one of his planes at Caldwell Airport, "if the weather conditions are clear" (C. McKenna: 2489-90).

According to Foresto, for even a "reasonably competent" pilot, it would not be difficult to "dispose" of an object during such a trip; the pilot could reduce speed, reach across the narrow cockpit to open the passenger door, and simply push the object out (Foresto: 2553-55). Ejecting an object from the passenger door would be simpler still, should the pilot just raise the plane's nose and use the rudder to bank to the right -- "not a difficult" maneuver, and one on which pilots are tested (Foresto: 2555-57, 2560-62).

Sergeant Matthew Rowley ("Rowley") of the police department's Aviation Unit performed three flights on October 11, 2000. On each occasion, the sergeant, acting without assistance, loaded a 110 pound duffel bag into a Cessna 172 rented from McDan Aviation at Caldwell Airport (Rowley: 2510-11, 2915-21, 2926, 2931-32). He then flew about 20 miles over the ocean, slowed down, raised the nose of the plan, and dumped his duffel bag (Rowley: 2914, 2921-25, 2926-27). Twice he ejected the bag from the passenger door; the third time he dragged it over his lap and expelled it from the pilot door (Rowley: 2926). Though the sergeant was a novice at dumping bags from planes, it was

unnecessary for him to bank the plane on these occasions (Rowley: 2926). The jury was shown videotapes of Sergeant Rowley's activities, taken from the rear seat of his plane and from an accompanying helicopter (Rowley: 2929-20, 2921, 2927-39; P. Ex. 21-23).

At trial, the jury also heard a stipulation that a woman's torso was recovered near "the Navy pier" on Staten Island on May 21, 1989 (Stipulation: 2946). Based on x-ray analysis, the Medical Examiner's office initially determined that the torso was Katz's; however, in 1998, DNA analysis "conclusively" proved that this determination had been incorrect (Stipulation: 2946-48).

Joel Davis ("Davis") the only defense witness, who was 60 years old at the time of trial, had been in the textile business and then "different types of investments," was in 1985 a volunteer worker (Davis: 3020-24).

Davis told the jury that on July 7, 1985, he visited H&H Bagels, on 2d Avenue in "the 80's" and went with a "girlfriend" he saw for perhaps two years, but whose last name he had since forgotten (Davis: 3024, 3034-35). At 2:00 or 3:00 p.m., or possibly as early as 1:00 p.m., he

48

noticed a woman he had never seen before as she stood in line (Davis: 3024-25, 3030, 3034, 3039, 3052-54). Davis recalled that this woman was with a second woman, apparently "a very close friend;" they were both in "beach attire" and deeply tanned, and that he saw "a lot of oil" on their bodies and that each woman carried a large beach bag; at trial he was unclear as to whether either woman had a beach chair (Davis: 303-38, 3047-48, 3056).

Davis looked at the first woman frequently, because "a combination of things" drew his attention to her because in the first place, Davis had been in the textile business, and the woman wore a very attractive t-shirt bearing a "very distinctive" print which included a representation of a map or an island done in a "magnificent" way, "probably" in "several" colors. After admiring that shirt, Davis ultimately looked at the woman in this shirt "as a man" would, and was attracted to her; the woman's face reminded him of the face of a friend's ex-sister-in-law and her body was like that of Davis's ex-wife and was an "excellent, great body," and he thought her chest was "well-developed" (Davis: 3025-26, 3039-47). Davis pointed the woman out to his girlfriend, and thought

to himself -- and may have remarked to his companion -- that the woman was "a good looking woman" (Davis: 3025).

Two or three weeks later, Davis saw posters depicting Katz, and called the police (Davis: 3026-27, 3048-50). In September, 1985, Davis was shown a photograph of Katz and at trial, he recalled that he said he was positive the photo depicted the woman from H&H Bagels (Davis: 3027-29, 3056-58). He did not recall saying to the detective that he was not sure (Davis: 3058-60). He "possibly" said to the police that the woman had worn pink shorts, but did not mention her attractive t-shirt (Davis: 3050), and indeed "possibly" described the t-shirt as white and loose-fitting (Davis: 3055). Davis later insisted to a defense investigator that Detective O'Malley had not shown him pictures, but he was confused about to whom the investigator was referring (Davis: 3061-63). He also told the investigator that the woman at H&H Bagels was "statuesque," but he was confused when he said that as well; the woman was only about five feet one inch tall (Davis: 3064-65). At trial, Davis explained that when he called the woman "tall" and "statuesque"

I confused her, I confused my ex-wife's body in which she was five-foot one with my friend's ex-sister-in-law, who is tall, but had her face. So I was confusing two different women in regards to that

(Davis: 3067).

Detective O'Malley interviewed Davis at Davis's home on September 24, 1985, and showed him three photographs of Katz (O'Malley: 3074-77). Davis picked one and said that it "could be the girl" that he saw "in the flier," but that he was not sure (O'Malley: 3077-78). Davis seemed to "relate" to the photographs, as "it reminded him of his ex-wife" (O'Malley: 3078). Davis also said that the woman in the flier was "similar" to the woman he saw in the bagel store (O'Malley: 3079-80).

The People introduced a 1985 photograph of Katz wearing a two-piece bathing suit, and Alayne Katz testified that the photograph accurately depicted Katz, who was under five feet three inches and wore an "A cup" bra (A. Katz: 3072-73; P. Ex. 73).

## The Indictment Delay

As set forth during the trial, an investigation was commenced upon the report by the Petitioner that Katz was missing, but her body was not recovered.

Investigator Wittman, as part of the "Closing Report" dated April 27, 1987, wrote the following:

> On 4/24/87 the writer was informed by ADA Fogel that Pitler agrees that at this time the case should be closed. Chief Rosenzweig is in agreement that at present no further action is required by the Investigations Bureau. Pending unforeseen developments this case is closed.

(Exhibit O to White Affirmation in support of Bierenbaum's 440 motion).

In paragraphs 31-33 of ADA Bibb's affirmation in response to Bierenbaum's 440 motion, ADA Bibb stated that a Medical Examiner's Office radiologist concluded that the torso found washed up in Staten Island in 1989 could be Katz's, and a forensic radiologist consulted by the Medical Examiner's Office concluded that it was Katz's, the Department of Health Office had issued a death certificate for Katz, "[i]t was decided that the investigation into the

death of Gail Katz Bierenbaum would not be presented to the grand jury." In paragraph 49 of that affirmation, ADA Bibb stated that DNA testing in 1998 showed that the torso was not Bierenbaum's and "[t]he investigation again turned into a homicide investigation without a body."

The People conceded that "the investigation was reopened despite the lack of any new evidence" (Bibb Affirmation filed in response to Bierenbaum's 440 motion, ¶ 53) and that "a thorough and exhaustive investigation of Gail Katz Bierenbaum's disappearance" had been conducted from July 1985 until April 1987. (Bibb Affirmation filed in response to Bierenbaum's 440 motion, ¶ 14.)

On October 17, 1986, investigators with the District Attorney's Office learned that Bierenbaum, a licensed pilot, had rented an airplane from McDan Aviation on July 7, 1985, the date of Bierenbaum's disappearance (2568-70). Federal Aviation Administration regulations required Bierenbaum to keep a flight logbook in 1985. See, 14 C.F.R. §§ 61.51, 61.59. Furthermore, on December 18, 1986, at a meeting between Greenfield, Bierenbaum, and Detectives O'Malley, Dalsass and Powers, the detectives

asked Bierenbaum if he kept a flight log, a question which
Greenfield interdicted. (2963-65).

The Respondents have asserted that "it took time
to discover that the Petitioner not only flew from Caldwell
Airport on July 7, 1985 but also changed his flight log to
obscure that fact." Two witnesses who flew in Bierenbaum's
plane in the 1990's out of Las Vegas testified that he
always made entries in the log when flew with them. (2893,
2828). However, Karnofsky, Feis, Katz and other witnesses
who flew with him in 1985 and 1986 out of New Jersey did
not. The People first learned about the existence of that
flight log from Karnofsky, whose romantic relationship with
Bierenbaum ended in an unfriendly manner due to
Bierenbaum's having cheated on her. (2761-61, 2765-66,
2803-04).

The respondents also noted that women with whom
Bierenbaum had romantic relationships in the 1990's --
Stephanie Youngblood, Carole Gordon Fisher, Elise Sauer and
Kim Angel -- were interviewed during the reopened
investigation and each of these women described
conversations with Bierenbaum in which he gave them
"inconsistent versions" of Bierenbaum's disappearance.

The indictment was returned on December 8, 1999.

## The Standard for Constitutionally Adequate Representation

To demonstrate constitutional ineffectiveness, defendant must first show "that counsel's performance was deficient." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Lockhart v. Fretwell, 506 U.S. 364 (1993); Lindstadt v. Keane, 239 F.3d 191, 198 (2d Cir. 2001). To make this determination, the court must decide whether "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 689. Counsel's conduct must be judged on facts of the particular case, viewed as of the time of counsel's conduct. See id. at 690; see also Lockhart, 506 U.S. at 372. The reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and be careful to "eliminate the distorting effects of hindsight." Strickland, 466 U.S. at 689.

In addition to showing deficient performance, the defendant must show that the deficient performance prejudiced the defense; it must be shown that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is one that "undermine[s] confidence in the outcome." Id.

Where a petitioner seeks habeas corpus relief, under the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254,

> a writ may issue only if . . . the state court
> adjudication resulted in a decision that . . .
> involved an unreasonable application of . . .
> clearly established federal law, as determined by
> the Supreme Court of the United States. . . .
> Under the 'unreasonable application' clause, a
> federal habeas court may grant the writ if the
> state court identifies the correct governing
> legal principle from [the Supreme Court's]
> decisions but unreasonably applies that principle
> to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 413 (2000).

In a petition for habeas relief based on ineffective assistance of counsel, the question as to whether the matter is governed by existing Supreme Court

precedent is "easily answered because the merits of [such] claim[s] are squarely governed by [the Supreme Court's] holding in Strickland v. Washington," Id. at 390; see also Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001). A petitioner is not required to further demonstrate that his particular theory of ineffective assistance of counsel is also clearly established. Aparicio, 269 F.3d at 95 n.8; Sellan v. Kuhlman, 261 F.3d 303, 309 (2d Cir. 2001). Application of the New York State standard set forth in People v. Baldi, 54 N.Y.2d 137 (1981), is essentially consistent with the Strickland standard, so that relief is appropriate only if the legal principle was unreasonably applied. Lindstadt, 239 F.3d at 198.

Ineffective assistance can be established by counsel's failure to make a motion or take action where such motion or action would have been successful and there is no tactical reason for failing to do so. See Brown v. United States, 167 F.3d 109, 110 (2d Cir. 1999).

In addition, failure to investigate or present exculpatory witnesses or other exculpatory evidence for no tactical reason can also amount to ineffective assistance. See Strickland 466 U.S. at 691; Lindstadt, 239 F.3d at 200.

57

Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance. See Strickland, 466 U.S. at 689; Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998). A petitioner may rebut the suggestion that the challenged conduct reflected merely a strategic choice by showing that "counsel omitted significant and obvious issues while pursuing other issues that were clearly and significantly weaker." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994), cert. denied, 513 U.S. 820 (1994).

## a.    The Failure to Move to Dismiss the Indictment as Untimely

Petitioner has faulted his trial counsel for failing to move to dismiss the indictment on the grounds that it was untimely.

A delay in instituting a prosecution may implicate the accused's right to due process. United States v. Lovasco, 431 U.S. 783, 789 (1977); People v. Lesiuk, 81 N.Y.2d 485, 490 (1993). In evaluating whether a delay violates due process, a New York court will balance five factors: (1) the length of the delay; (2) the reasons

for the delay; (3) the nature of the underlying charge; (4) whether there has been an extended period of pretrial incarceration; and (5) whether the defense has been impaired. People v. Taranovich, 37 N.Y.2d 442, 445 (1975). In making this assessment, no "one factor or combination of the factors . . . is necessarily decisive or determinative of the speedy trial claim, but rather the particular case must be considered in light of all the factors as they apply to it." Id.

Here, over fourteen years passed between the crime and the filing of the indictment. However, New York courts have not dismissed serious charges when only that factor operates in the defendant's favor. See, e.g., People v. Vernace, 96 N.Y.2d 886, 887-88 (2001) (affirming conviction, when indictment brought seventeen years after commission of crime); People v. Salcedo, 304 A.D.2d 309, 309-10 (N.Y. App. Div. 2003) (same, after sixteen year delay); People v. Tsang, 284 A.D.2d 218, 218-19 (N.Y. App. Div. 2001) (same, after twenty year delay); People v. LaRocca, 172 A.D.2d 628 (N.Y. App. Div. 1991) (same, after seventeen year delay).

Because Katz's body had not been recovered, it was appropriate to delay the charges to await the passage of time. Because of the absence of a body, the evidence was circumstantial and could depend upon small details. The prosecutors who considered whether to seek an indictment in 1987 quite rationally elected to await further developments.

Additional evidence was obtained over time. The passage of time without any word from or sighting of Katz enhanced the circumstantial proof that she was murdered. In addition, the People submitted on trial evidence of the Petitioner's consciousness of guilt which evidence was obtained over time. While investigators discovered that Petitioner flew from Caldwell Airport on July 7, 1985 (T. 2568-70), his flight log, which the People alleged had been altered, was not discovered or subpoenaed until 2000.

After time had passed, a newly created unit designed to investigate so-called "cold cases" was formed; this unit reviewed the case in the normal course of their duties and made the professional judgment to go forward (PApp A: 4). New York courts consider decisions of this sort proper and acceptable explanations for pre-indictment

delay. See Vernace, 96 N.Y.2d at 888; Lesiuk, 81 N.Y.2d at 490; Singer, 44 N.Y.2d at 254.

The charge of murder was, of course, serious and for the reasons already noted a more complex case than the routine homicide.

As to incarceration, Petitioner was at liberty during the years from the murder in 1985 to the indictment in 1999.

As to the final Taranovich factor, here has been no showing that the Petitioner's defense suffered from the delay. Petitioner realized immediately that he was a suspect in his wife's disappearance, and he hired a lawyer in 1985, one of the two attorneys who represented him at trial.

The passage of time certainly dimmed the memories of those who were witnesses to the events of Petitioner's marriage and to Katz's disappearance. However, the People had the burden of proof beyond a reasonable doubt, and failures of memory made it more difficult for the People to satisfy that burden. See, e.g., Vernace, 96 N.Y.2d at 888.

Petitioner has argued that various individuals might have recalled something helpful to him, had they testified years before they did. That general complaint cannot serve to establish cognizable prejudice. See United States v. Williams, 372 F.3d 96, 113 (2d Cir. 2004).

The Petitioner has not cited a single exculpatory witness or piece of evidence that was available in or about 1985, but no longer available by 1999.

> There is no reason to assume that, had the trial taken place earlier, either the witnesses who testified for the prosecution or those who were unavailable in 2000 would have recalled facts that were helpful to the defense, rather than facts that were simply more damning

(PApp: A at 10-11).

All of these considerations were put to the state court, when petitioner complained after trial of the conduct of his attorneys. The state judge considering Petitioner's motion assessed the five Taranovich factors. She then concluded that, had Petitioner's counsel made a motion to dismiss, "there is no possibility" that the

motion would have been granted, and that "[t]here was no chance of success" for such a motion (PApp: A at 9).

Nothing has been presented in this proceeding to alter the state court conclusion:

> In sum, although the pre-indictment delay was significant, defendant was not incarcerated at any time prior to trial. If he can be said to have suffered any prejudice from the delay, it was not substantial. Both the seriousness of the charge and the reason for the delay strongly militate against dismissal. The People proceeded in good faith and did not delay the prosecution in the hope of gaining a tactical advantage. Their caution was justified by the complete lack of direct evidence against the defendant, as well as the absence of direct proof that Gail Katz was dead. For these reasons there is no possibility that a motion to dismiss on the basis of pre-indictment delay would have been granted. Defense counsel cannot be faulted, therefore, for not filing such a motion.

(PApp: A at 17-18).

The state court concluded that defense counsel was not ineffective for failing to move to dismiss the indictment for untimeliness because Petitioner did not suffer prejudice from the delay. That conclusion was reasonable and not contrary to established federal law. Williams v. Taylor, 529 U.S. at 412-13.

## b. The Conduct of Defense Counsel at Trial Was Reasonable

The Petitioner has asserted that the opening statement of his defense counsel led to otherwise inadmissible evidence with respect to the effort of the police to conduct a forensic search of Petitioner's apartment. Counsel who opened on Petitioner's behalf was not the attorney retained by Petitioner in 1985, and he advised the jury that a forensic examination of Petitioner's apartment had turned up no suspicious evidence. The People elicited evidence that Petitioner's attorney retained in 1985 had refused to permit a complete forensic examination. The prosecutor noted the evidence about the bar to a search only to remind the jury that Petitioner had lied when he said to Caruana that the police had searched his apartment. As set forth by the state judge who denied Petitioner's post-judgment motion, the reference to this was of little import (PApp: A at 26-28). In addition, as also noted by the reviewing judge, trial counsel effectively informed the jury that it was not Petitioner, but his attorney, who declined to cooperate with the police (PApp: A at 28-29).

The Petitioner has asserted that his attorneys acted unreasonably because they did not call Pablo Alvarez and June Sherman at trial.

As testified to at trial, Petitioner initially advised the police that doorman Edgar Rivera reported seeing Katz leave her apartment building on the morning of July 7, 1985 but Rivera testified that he last recalled seeing Katz the day before she disappeared. Before trial, Petitioner's attorneys interviewed Pablo Alvarez ("Alvarez"), a porter who worked at defendant's building. Alvarez advised that he saw Katz leave on July 7th, wearing shorts and a t-shirt. Counsel decided not call Alvarez as a witness.

As the state trial judge determined, however, counsel's determination was a readily defensible strategic judgment (PApp: A at 20, 22-23). He told the authorities in July 1985 that he did not recall seeing Katz on July 7th, and that he did not remember how she was dressed on the last occasion on which he saw her. He made similar statements to investigators in 1999 and 2000 (People's Memorandum of Law in Opposition to Post-Judgment Motion at 12-13). Alvarez believed that he had testified in the

grand jury, when he had not. Reasonable attorneys could readily decide not to call a witness who would be unable to explain on cross-examination how he had come to remember an unremarkable event from 15 years before, when he had been unable to recall that matter just days after it had occurred.

In 1985, June Sherman ("Sherman") lived in the apartment below Petitioner's. In 1985, Sherman told the police only that Bierenbaum and Katz fought constantly, like "cats and dogs." In 1998, she related that the two always fought on Sundays, that she frequently heard screaming and the sound of banging furniture, that on July 7, 1985, she heard screaming and the sound of Katz's high heels on the floor and she then heard a loud bang, apparently the slamming of a door -- but not necessarily the front door of the apartment -- followed by silence (PApp: A at 18; People's Memorandum of Law in Opposition to Post-Judgment Motion at 13-15).

After trial, Petitioner's new counsel obtained an affidavit from Sherman explaining that, if called as a witness, she would have testified that she believed what she heard was the sound of Katz leaving Petitioner's

apartment (PApp: A at 19). Petitioner now asserts that the failure to call Sherman was professional incompetence.

However, defense counsel in fact sought to call Sherman. During trial, counsel obtained a material witness order and provided Sherman's Arizona address to Arizona attorneys retained to serve the order on Sherman. Over the two remaining weeks of trial, the attorneys could not locate Sherman. As the state court determined, it might have been "prudent" had defense counsel contacted Sherman earlier (PApp: A at 21), but their efforts were nonetheless "diligent," and "it was reasonable to believe that she would be available in time to be interviewed and . . . testify" (PApp: A at 21).

In any event, the inability to call Sherman did not prejudice the defense, for there is no "reasonable likelihood" that her testimony would have led to an acquittal. Sherman's only information potentially helpful to the defense was that, during Petitioner's fight with Katz on July 7th, she heard a door slam, followed by silence. That testimony, even if fully credited, did not establish that Katz left the apartment. As the state court concluded, if the jury did not conclude that the slammed

door was the front door to the apartment, "it would have undermined the scenario suggested by the defense and strengthened the prosecution's theory that [Petitioner] had killed [Katz] in the apartment" (PApp: A at 22).

Sherman's testimony of constant fighting between Petitioner and Katz, including a screaming match just prior to Katz's disappearance, also would have been damaging to the defense. Sherman's account of hearing Katz's high heels on July 7th was also inconsistent with Petitioner's claim that Katz wore sandals when she left the apartment. Finally, Sherman did not offer the details about the slamming door and the ensuing quiet when interviewed in 1985 and only elaborated when she spoke with the authorities in 1998 and 2000.

Inability to locate and present such testimony under all the circumstances is not unreasonable.

Petitioner has also contended that counsel did not do a better job of labeling Katz as a serious cocaine abuser. Segalas testified at trial that he and Katz used cocaine together twice. However, in 1985 Segalas had told a detective that he and Katz used cocaine on "numerous"

occasions. Petitioner has contended that counsel failed to
impeach Segalas with this statement to enhance the
possibility that Katz was killed by narcotics dealers.

Counsel stated that he saw no need for the
suggested impeachment, and the trial judge agreed (PApp: A
at 31-33). The theory that she was killed by drug dealers
was without any evidentiary basis, as noted by the
Appellate Division. 301 AD.2d at 136.

In the People's summation, the prosecutor argued
that Petitioner intentionally strangled his wife.
Petitioner has assigned as error the fact that trial
counsel did not object to the prosecutor's remarks, on
grounds, for example, that they were too graphic, were
unsupported by the evidence. The state judge who denied
Petitioner's post-judgment motion had two reasons for
rejecting that complaint. In the first place, trial
counsel had a reasonable, tactical basis for failing to
object: he feared that if he interrupted the People's
summation, the trial judge would "sum up" in favor of the
prosecution. The post-judgment court credited that
explanation, and even supplemented it with another (PApp: A
at 23-24). As the court correctly held, counsel's choice

was a tactical "judgment call." The state court observed: "[H]ad trial counsel contemporaneously objected he would only have preserved meritless issues for appeal" (PApp: A at 35).

Petitioner now complains that defense counsel was incompetent because during trial, defense counsel advised the jury that Katz was dead, that she "likely" died on July 7, 1985, and conceded that Petitioner had once choked her, and that Petitioner was a man with a substantial temper. As the post-judgment motion court recognized,

> Defendant was not prejudiced by his attorneys' concession that Katz was dead, as the proof permitted no other inference. Had they not made the tactical choice of defusing the issue in this manner they would have been placed in the counter-productive and almost ludicrous position of arguing that she had vanished without a trace but was still alive fifteen years later. There was also sufficient proof in the record to have made it impossible for the attorney to have contested the choking incident and defendant's bad temper. The jury heard too many corroborative accounts to have had any doubts as to these facts and conceding them was therefore not prejudicial. Additionally, as is clear from the affidavits of trial counsel made a strategic decision to concede them based on his assessment that they were necessary to show why the Bierenbaums sought counseling. His decision should be second-guessed with the wisdom of hindsight . . . .

(PApp: A at 25).

Counsel certainly did not suggest to the jury
that he, or Petitioner, knew when Katz died. His
recognition that she "likely" died on the day she
disappeared can be considered a sensible technique designed
to defuse a no-win issue. As the court noted, "the
circumstances surrounding the disappearance of Katz as well
as other evidence in the case . . . compel the conclusion
that she died on July 7th" (PApp: A at 26). Further, the
defense was that Petitioner simply did not know how she
died and stated the obvious -- that Katz "likely" died when
she disappeared.

Petitioner also asserts that his counsel acted
unreasonably by failing to produce evidence of the Police
Department's Patrol Guide, which in 1985 stated that
persons over 18 who left their homes for personal reasons
would not be considered "missing" until sufficient time
passed for their absence to be considered involuntary. The
prosecution having argued to the jury that Petitioner acted
callously when he, among other things, waited until the
night of July 8, 1985, to report that Katz had been missing
since the morning of July 7th. Apparently, the Patrol

71

Guide provisions were irrelevant because Petitioner would not have been aware of them. The post-judgment motion court concluded, "[t]rial counsel's judgment was correct and he was justified in not bringing the Patrol Guide provisions to the jury's attention" (PApp: A 41).

Petitioner now contends that his counsel was ineffective because he did not move for dismissal on the ground that proof of murderous intent was lacking. However, the prosecution contended that the evidence established Petitioner had killed Katz after an argument. That evidence supported an argument that Petitioner intended to kill. The post-judgment motion court put it succinctly:

It would have been pointless to make such a motion, as the record is replete with evidence from which the jury could have inferred, beyond a reasonable doubt, that defendant had the specific intent required by statute....As the Appellate Division noted, 'this abundant array of damning circumstantial evidence proves beyond any reasonable doubt that defendant intentionally killed his victim...'

(PApp: A at 43-44).

Under New York law, the trial court has discretion to admit demonstrative evidence that might aid the jury. In this case, the court admitted videotapes of demonstrations by a police officer that it is possible for an individual to load a 110 pound weight onto a Cessna 172 and then dump it over the ocean. Petitioner has contended that trial counsel did not object to the admission of the videotapes, but, the opinion of the post-judgment motion court disposed appropriately of this contention:

> This contention is without merit, as the Appellate Division indicated by way of dictum that the videotapes were properly placed before the jury....As the evidence in question was admissible, the attorney was not ineffective in failing to object to its introduction . . .

(PApp: A at 33).

The Petitioner has contended that counsel was ineffective for failing to move to dismiss on the ground that there was legally insufficient proof that he murdered Katz in New York State. However, evidence was presented to show that Petitioner argued with his wife in their Manhattan apartment, and that he then killed her. Petitioner has suggested here that he might have driven

with his wife to New Jersey on the afternoon of July 7, 1985, and killed her there (Pet. P. 54). However, statements made by Petitioner himself were to the effect that he last saw his wife alive in their apartment at 11:00 a.m. on July 7th, and that he went to New Jersey alone. Those admissions establish that trial counsel was not ineffective for failing to make such a motion.

DeCesare testified to statements made to her by Katz concerning a threatening comment Petitioner had made to her. As DeCesare recalled it, Katz said that she and Petitioner were watching a movie about the Claus von Bulow case when Petitioner told her that von Bulow's mistake was leaving evidence, and that he would not leave evidence. Petitioner has asserted that this was devastating testimony, but that it could not be true, in that the only movie about the von Bulow case was made in 1990. He now contends that his trial counsel were ineffective because, during the weeks between verdict and sentence, they did not investigate whether films about the von Bulow case had been made, discover the error, and move for a new trial based upon it.

The court which denied Petitioner's post-judgment motion that "[i]t would have been remarkable" for it to occur to counsel to investigate "this relatively minor aspect of the trial" before sentence (PApp: A at 44). In addition, as found by the court, under New York law a motion for a new trial could not be based upon the discovery of evidence that merely "impeached or contradicted" a witness (PApp: A at 45). Further, the interval before sentencing was not a critical period, in that if a motion for a new trial could lie at all, it could have been brought after sentence under Section 440.10 of the New York Criminal Procedure Law.

At the time of Petitioner's admission and Katz's statement about it, the von Bulow case was prominently featured in television news reports, as von Bulow's trial conviction had been reversed and a new trial ordered. State v. von Bulow, 475 A.2d 995 (R.I. 1984). Whether it was a movie or a news report that caused Petitioner's comment would not substantially affect the impact of DeCesare's testimony.

## C. **Petitioner's Sixth Amendment Right to Confront Witnesses Against Him Was Not Violated**

Petitioner has also asserted that hearsay was received at this trial in violation of his Sixth Amendment right to confront witnesses.

However, a habeas corpus petitioner cannot present a federal claim to a District Court unless he has first "exhausted" that claim by advancing it in the highest state court with jurisdiction to entertain it. Bossett v. Walker, 41 F.3d 825, 828-29 (2d Cir. 1994), cert. denied, 514 U.S. 1054 (1995). In this case, petitioner did not argue, in his application for leave to appeal to the New York Court of Appeals, that his federal confrontation rights had been violated by the admission of hearsay at his trial. Petitioner's entire argument was instead based on New York's hearsay rules.

Generally, a failure to exhaust state remedies obliges the petitioner either to return to state court, or to abandon the unexhausted claim. See Rose v. Lundy, 455 U.S. 509, 510 (1982); Zarvela v. Artuz, 254 F.3d 374, 380-82 (2d Cir. 2001), cert. denied, 534 U.S. 1015 (2001). In

this case, while Petitioner could have presented his Confrontation Clause claim to the Court of Appeals, he did not, and can no longer do so. People v. Liner, 70 N.Y.2d 945, 945 (1988). As a result of his failure to present the claim to the Court of Appeals, Petitioner likewise cannot present that claim in post-judgment proceedings in the state trial courts. N.Y. C.P.L. § 440.10(2)(a), (2)(c).

When a Petitioner's procedural error in presenting a claim prevents him from thereafter exhausting the claim, the error forfeits the claim, "absent a showing of cause for the procedural default and prejudice resulting therefrom." Grey v. Hoke, 933 F.2d 117, 121 (2d Cir. 1991). Petitioner has made no such showing.

Furthermore, the admission of the statements did not offend Petitioner's right to confront witnesses against him. The Confrontation Clause applies only to "testimonial" statements. Davis v. Washington, 126 S.Ct. at 2274-76. A non-testimonial statement, "while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." Id. at 2273.

The statements by Katz about which defendant now complains were not "solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact." Id. at 2274 (quoting Crawford v. Washington, 541 U.S. 36, 51 (2004)). The declarations here at issue were confidences imparted by Katz to her friends and relatives, and were in no sense intended to be official reports which would some day be aired in a court room. Aside from the statement of Katz's cousin, Hilliard Wiese, which the Appellate Division found to be harmless error, none of the statements at issue was admitted for the truth of the matter. Bierenbaum, 301 A.D.2d 119, 144, 149. Rather, each of these statements was admitted to demonstrate Katz's state of mind, or the state of the Katz-Bierenbaum marriage. See id. Statements not admitted for their truth do not implicate the Confrontation Clause. Crawford, 541 U.S. at 59 n.9.

Accordingly, the admission of Katz's out-of-court statement was not "contrary to" and did not "involve[] an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

### c.   **The Conduct of Appellate Counsel Was Reasonable**

The omission even of an obvious appellate point gives rise to proper complaint only if counsel advanced "clearly and significantly weaker" claims in its place. Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994). "Appellate advocacy is meaningful if it reflects a competent grasp of argument." People v. Stultz, 2 N.Y.3d 277, 285 (2004).

Petitioner's appellate attorneys, one of whom had represented him at trial, were familiar with the trial record.   In their brief to the Appellate Division, Petitioner's counsel outlined their contentions in a 33-page filing, and then presented a cogent argument that guilt had not been sufficiently demonstrated (PApp: H, Petitioner's Appellate Division Brief at 4-37, 115-25).   In addition, counsel presented highly sophisticated Molineux and hearsay claims (id. at 38-104).   They then added two arguments that speculative and prejudicial proof had been admitted, and concluded with a contention that the indictment should be dismissed, or at least, a retrial should be held before a different judge (id. at 105-14; 125-30).   After the People responded, a 52-page reply brief

defended all points presented in the main brief (PApp: H, Petitioner's Reply Brief at 39). When the judgment was affirmed, Petitioner's attorneys applied for leave to appeal to the Court of Appeals in long letters that pressed three preserved points and noted others that might also have interested the Court. Finally, counsel presented an extended Confrontation Clause complaint in a petition for certiorari.

Petitioner has contended that reasonable appellate counsel would have presented one additional claim: that the trial court erred in granting the People partial relief pursuant to Batson v. Kentucky, 476 U.S. 79 (1986).

The Petitioner now asserts that the state trial court misunderstood the three-step Batson procedure for determining the validity of peremptory challenges, and as a result wrongly shifted the burden of proof to Petitioner.

The parties are in accord as to what a trial court must do to resolve a Batson challenge. Resolution of such a challenge requires a three-step process: First, the challenger must make a prima facie showing the peremptory

strikes were purposely used to exclude members of a cognizable group; Second, the respondent must rebut this inference of discrimination by providing a neutral explanation; Third, the court must weigh the evidence and determine if the challenger has met his burden of persuasion that the peremptory strike was motivated by unlawful discrimination, not the proffered neutral explanation. Batson, 476 U.S. at 97-98.

Potential jurors were individually examined in camera about whether they could fairly evaluate testimony on a charge of murder and testimony with respect to domestic violence. Near the end of the single "round" (1759), the People suggested that the defense had exercised discriminatory challenges against women in violation of Batson. The court immediately recognized that "there is no question that the defense has challenged most of the women on this panel" (1759). The court noted that the prosecution was obliged "to make a prima facie showing that the related strikes were related to sex" (1760). The Assistant District Attorney answered that the court had made the same point in an earlier off-the-record conversation, but that "every challenge that they have used save two have been females and sheer numbers demand at

least at this point" that the People offer a challenge (1760).

The court responded:

I do think there is a serious issue when the Defense challenges most of the women, the young women on the panel and, frankly, the only thing is that in view of the fact that I was present obviously for a lot of individual screening, I don't know whether you can pass step one of Batson but if I were you, it's your obligation, both sides, to make a Batson challenge where it appears to be warranted.

(1761-62). The court added that the prosecutor could review his notes, and should not make a formal Batson application if "after you look at it seriously there is no possibility of meeting the Batson test, and step one is what I am talking about clearly . . ." (1763).

After a recess, the prosecution made a formal Batson challenge 1769-73). The People argued that the defense struck as many women as possible among the first forty-four jurors who faced challenges and sought completely to avoid the remaining jurors, almost all of whom were women (1772). The prosecutor concluded "that the sheer numbers make out a prima facie case and that the

court . . . should acquire of the defense the neutral reasons for each challenge" (1772). He continued, "Gender neutral challenges reasons for each of their challenges" (1773).

The court's answer was clear:

I take Bibb's [the Assistant District Attorney's] point to this extent. I want you now to have the burden to come forward to indicate why these peremptory challenges against all these women were exercised to overcoming discrimination. I want to hear a gender-neutral explanation

(1773). Defense counsel responded that he "would like to talk about the prima facie . . ." (1773). The only fair reading of the following remarks is that the court ruled that the prima facie issue "was pretty obvious" and repeated that defense counsel should address individual strikes (1773-74).

The defense next offered explanations for its challenges (1774-80), noting at one point that the "question is whether [challenges] are gender neutral" (1777). The Assistant District Attorney did not deny that the defense explanations were gender neutral; obviously

meaning to move to stage three of the Batson test, he argued that "many of these reasons are transparent" and that the defense "kept other people in similar situations" (1780-81). The court interrupted to note that some defense explanations were "non-potectual [sic]," and thus valid (1782-83). The court added:

> I am sympathetic to your position in the sense that I clearly see what has happened here. I clearly agree that there may be a secondary agenda. That is not what the law says. The law permits them to exercise their peremptories and to come forward with the gender neutral explanations for striking the jurors and the law says very clearly in People v. Allen, this is not a heavy burden that it can be satisfied by a fairly neutral explanation quoting from People v. Allen, 86 N.Y.2d, 101 and we also know that non-potectual [sic] reason does not rise to the level of the challenge for cause.
>
> People v. Hernandez. Now when the proper explanations appear to be gender neutral I have to determine whether the proponents of the strike has proven purposeful discrimination and the focus is whether the gender neutral explanation is a mere pretext for the gender discrimination

(1783-84).

In response, the prosecutor urged the court on to "the third step" (1785-86). The court answered that "[y]ou have the burden of persuading." The Assistant District

Attorney "The third step is gender neutral or pretextual.
The best and easiest way to see if it is pretextual is to
see if there are similarities, people similar that they
kept" (1786). After the court noted, "[y]ou came up with
one such similar person," a second Assistant District
Attorney began to explain why the "allegedly gender neutral
explanations" were pretextual. He began by suggesting that
"the case law permits the Court to look to the people they
allowed to be seated," and the judge answered "I know that"
(1786). In answer to a defense objection, the court added:

> They have a right to show me that you put on
> people who are in exactly a similar position—
> kicked off people who are similar—in the similar
> position as people you left on

(1787).

The prosecutor limited his comments to five of
the jurors challenged by the defense. When he was done,
the court noted to defense counsel:

> They are pointing out some very important factors
> that you have to address that are clearly
> criteria that are looked at in case after case
> where you challenge somebody, let me finish, when
> you challenge someone claiming that it's gender

neutral and that person is exactly in the same
position as other people

(1791).      After    continued    debate    about    particular
challenges, the court asked the People what remedy they
sought.      The Assistant District Attorney answered that he
was asking the court to seat five of the women peremptorily
challenged by the defense (1795—96).  The court opined that
"this is a very close issue."  The court went on to say:

> I  am  absolutely  certain  that  the  defense  has
> deliberately  eliminated  women  but  I  am  not
> certain that they have done so in a manner which
> gives me the right legally -- I am not certain
> how I want to rule and whether you are entitled
> to a remedy.   It's an extremely close question,
> much closer than any Batson issue I have had
> because  there  are  ostensibly  reasons  for
> challenging many of the jurors and they have
> offered those reasons.   I then have to determine
> whether they are pretextual and, et cetera, et
> cetera.  So this is a very delicate area.

(1796-97).

The   court   then   adjourned   the   proceedings   to
review the law.  When the court went back on the record, it
observed that

> I pulled out a couple of cases that I was looking
> for and couldn't find in my file.

86

And I'm not going to re-state the law. I've
referred to it several times. We're all familiar
with the basics of Batson, the steps, and the law
itself.

(1798). Next, the court briefly described three Appellate
Division Batson decisions it had reviewed during the
preceding adjournment, and made its ruling. (1798-1800)

Petitioner has suggested that a winning appellate
argument might have been grounded on a claim that the court
misunderstood the law, but the record fails to establish
that proposition. A claim that the trial court misapplied
Batson procedure would have had to be preserved by specific
objection at trial. See People v. Richardson, 100 N.Y.2d
847, 853 (2003). Petitioner's trial counsel made no
objection on that front.

The prosecution argued that defense excuses for
challenges to women were unbelievable by pointing to men
with the same characteristics who were not challenged
(1780-87). Defense counsel responded to each suggestion by
proffering new reasons why the unchallenged jurors might be
considered different from the accepted jurors (1787-95).
The trial court heard defense counsel, and concluded that

these defense explanations were mere pretexts for discrimination (1801-02). At the end of the argument about the defense strikes, the prosecution asked that the court seat five jurors: Barrett, La Branche, Gevalt, and two others. The court seated the three named jurors. As to each, the defense challenges could be considered pretextual as the trial court concluded, the defense having accepted other jurors with similar characteristics (1801-02).

Petitioner also has maintained that a competent appellate attorney would have protested about the remedy accorded. The trial court found that Petitioner wrongly challenged at least five potential jurors because they were women. The court then decided that, to be "fair," it would seat only three of the five.

Petitioner has noted that the Appellate Division reversed this trial judge in another case for seating only one of three jurors who were the subject of a Batson challenge. In People v. Claudio, 10 A.D.3d 531 (N.Y. App. Div. 2004), the Appellate Division reversed because the defense was wrongly denied a full remedy for a Batson claim. The defense alleged that three jurors had impermissibly been stricken by the People; the trial court

seated only one of them, and made no ruling about the other two. Id. at 534. Here, it was the People who received an incomplete remedy, as the Court seated two of the five jurors it had found were impermissibly challenged based on sex. (1804).

The claims Petitioner's appellate counsel did advance were arguably more powerful than the Batson issue. An effective advocate could readily decide not to test the patience of an appellate court for adding a fact-intensive, partially unpreserved Batson point to what was already a 130-page brief. "Effective appellate representation by no means requires counsel to brief or argue every issue that may have merit." Stultz, 2 N.Y.3d at 285.

In light of the foregoing, the Appellate Division's conclusion that Petitioner was not denied his right to the effective assistance of counsel is appropriate. 2006 N.Y. App. Div. LEXIS 2772, at *1.

## Conclusion

For the reasons stated above, Bierenbaum's petition and motion for reconsideration are denied.

As Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253; see also United States v. Perez, 129 F.3d 255 (2d Cir. 1997); Lozada v. United States, 107 F.3d 1011 (2d Cir. 1997). Pursuant to 28 U.S.C. § 1915(a)(3), it is hereby certified that any appeal from this order would not be taken in good faith. Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

It is so ordered.

**New York, N.Y.**
**February  20 , 2008**

**ROBERT W. SWEET**
**U.S.D.J.**